# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3306

_____

United States of America,　　　　　　*
　　　　　　　　　　　　　　　　　　　*
　　　　Plaintiff - Appellee,　　　　*
　　　　　　　　　　　　　　　　　　　*　Appeal from the United States
　　v.　　　　　　　　　　　　　　　　*　District Court for the District
　　　　　　　　　　　　　　　　　　　*　of Minnesota.
James Naiden,　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　*
　　　　Defendant - Appellant　　　*

_____

Submitted: March 15, 2005
Filed: October 4, 2005

_____

Before MURPHY, BYE, and SMITH, Circuit Judges.

_____

MURPHY, Circuit Judge.

James Naiden was convicted by a jury of attempting to entice a child through the internet and mails to engage in unlawful sexual activity and of attempting to induce a child to travel for unlawful sexual activity. He was sentenced to 54 months and now appeals, arguing that the district court[1] erred by not admitting evidence of a comment he made to a friend. We affirm.

_____

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

On February 13, 2003, Detective Douglas Roderick of the Dayton, Ohio Police Department logged into an America Online chat room called "ILuvOlderMen" using the screen name Stephiek06. Roderick created an online profile identifying Stephiek06 as a fourteen year old girl named Stephanie from Dayton; this profile was available to other visitors in the chat room. Although "Stephanie" did not participate in the chat on that day, an instant message was sent to her by Naiden, who was using the screen name Jack123904.

Naiden identified himself as "James, single, 59, Minnesota." Stephanie responded that she was "Steph, single, 14, Ohio." They exchanged photographs,[2] and Naiden asked Stephanie whether she was a virgin. She said she was. Naiden then asked whether she would be interested in coming to Minneapolis for a visit, in which case her "virginity would be over." Stephanie expressed interest, and they discussed plans for her to buy a bus ticket. Naiden said he was concerned that these plans be kept secret so that he would not get into trouble. He also tried to learn what her mother's reaction would be if Stephanie pretended to run away for a few days. At the end of this first conversation, Naiden told Stephanie that he would "teach [her] how to fuck."

Naiden's instant messaging correspondence with Stephanie continued on February 15. He confirmed that she was fourteen years old and a virgin and suggested that they might marry in a few years when she would be seventeen or eighteen and he would be in his sixties. He told her to find her birth certificate "so when the time comes down the road," she could prove her age. Naiden explained his sexual plans for the two of them in explicit detail and told her to schedule her visit when she would not be menstruating. He also discussed taking nude photographs of her.

---

[2]Stephanie's photograph was actually that of a youthful police officer.

Initially Naiden told Stephanie during the February 15 conversation that he did not want to send her money for a ticket because he could be arrested for contributing to the delinquency of a minor but that he would buy her return ticket to Dayton after she arrived in Minneapolis. When she responded that it would take her two to three weeks to save up enough money from babysitting to buy a ticket to Minneapolis, he agreed to send her $30 for it. He sent the money in an envelope without a return address to a post office box which she told him belonged to her grandfather but was opened only by her. Naiden reiterated the importance of secrecy and asked again what her mother's response would be to her absence. He also shared his planned explanation to his landlady for Stephanie's presence: he would tell her that Stephanie was his niece and that she would be visiting a lot because her parents were separating.

The correspondence continued into March 2003. Stephanie had said she was in ninth grade, and on several occasions Naiden urged her to study hard and get good grades so that she could go to college. He also encouraged her to take a foreign language in her remaining three years of high school. In anticipation of their meeting, he advised her to get birth control pills from the school nurse and assured her that they would use baby oil so that her first experience with intercourse would not be too painful. He repeatedly expressed his concern about being caught, telling Stephanie on one occasion that a Minnesota man had recently been arrested for enticing a fifteen year old girl from South Dakota to come see him for sex. Naiden instructed Stephanie to delete his e-mails and told her he had not inscribed a gift book of his published poems because he was concerned that her mother's suspicions would be aroused if she were to see that it was signed by the author.

Stephanie told Naiden she had bought a ticket to Minneapolis for February 28, and she suggested they plan her return trip after she arrived. Naiden asked her to delay her visit, telling her in an e-mail, "We need a better plan before you come here. We need to think ahead of the game, not short-sighted. I can be arrested and lose everything I have if the police here or in your town find out and trade information." He insisted that they create a plan for both her arrival and departure and decide what

to tell her mother. About a week later Stephanie told him that her mother was going to spend a long weekend in Kentucky with her boyfriend and that there would be no school that Friday because of teacher training. She told Naiden that her mother had agreed to let her stay at a friend's house. He helped her make the remaining plans for a trip to Minneapolis on March 7 and for a cover story to tell her mother. In their last correspondence on March 5, Naiden told Stephanie, "[W]e will fuck like crazy for these two days."

Naiden was arrested at the Minneapolis bus station on March 7, 2003 by officers from the Minneapolis Police Department and the United States Postal Inspector. After being read his Miranda rights, Naiden told officers that he had not intended to have sex with Stephanie because he was impotent and because it is illegal to have sex with a minor. In his pocket he nevertheless had medication and a syringe for penile injection therapy, and evidence was later obtained that his erectile dysfunction was being treated successfully.[3] Searches of Naiden's car and apartment uncovered a new disposable camera, baby oil, and print outs of instant messages with many people but none with Stephiek06. He was subsequently indicted for attempting to entice a child through the internet and mails to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b), and of attempting to induce a child to travel for unlawful sexual activity, in violation of 18 U.S.C. § 2422(a).

At trial the government introduced evidence of Naiden's online relationship with Stephanie, as well as evidence of another with a fifteen year old girl from Texas. When that girl told Naiden she was a virgin, he had asked whether she would have sex with him if he traveled to Texas. Naiden's principal defense to the charges in this case was that he had not believed that Stephanie was under age and that he therefore lacked the intent to commit the crimes with which he was charged. He relied on evidence of his online relationship with a person using the screen name of

---

[3]Since Naiden did not testify, the government did not attempt to introduce his statements to the officers or the testimony of his treating urologist.

PixieTinkerbelle, whose profile described her as a seventeen year old high school student. Like Stephiek06, PixieTinkerbelle met Naiden in a chat room and conducted a sexually explicit correspondence with him. She eventually told Naiden that she was an adult, and Naiden used this experience to argue at trial that he had suspected that Stephiek06 was also really an adult. The jury convicted him on both counts, and the district court sentenced him to 54 months in prison.

On appeal Naiden argues that the district court committed reversible error by excluding proffered testimony from his friend Louise Viste-Ross. Naiden allegedly told Viste-Ross on February 14, 2003 that he had met someone online who said that she was fourteen, but that he did not believe she really was fourteen. Naiden conceded that his statement was hearsay but argued that it was admissible under Federal Rule of Evidence 803(3), which provides an exception to the hearsay rule for statements of the declarant's then existing state of mind. The district court ruled that Rule 803(3) did not apply to the proffered evidence and declined to admit it. We review the district court's decision to exclude evidence for an abuse of discretion and will reverse a conviction only when an improper evidentiary ruling has affected substantial rights or had more than a slight effect on the verdict. United States v. Ballew, 40 F.3d 936, 941 (8th Cir. 1994).

Naiden's statement that he did not believe his online acquaintance to be fourteen years old is hearsay under Rule 801 because it was an out of court statement offered to prove the truth of the matter asserted. That Naiden did not believe Stephanie was fourteen was offered to show that he had not intended to have sex with a minor. Naiden submits that the evidence fits the Rule 803(3) exception because the statement was of his "existing state of mind."

Underlying the Rule 803 exceptions is the idea that "circumstantial guarantees of trustworthiness" may be found in some hearsay statements, making them as reliable as in court testimony. Fed. R. Evid. 803 advisory committee's note. A key circumstantial guarantee of trustworthiness in respect to Rule 803(3) is that it requires

that statement be contemporaneous with the declarant's "then existing" state of mind, emotion, sensation, or physical condition. The advisory committee's note reports that the rule is essentially a specialized application of Rule 801(1), premised on the supposition that "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Fed. R. Evid. 803(1) advisory committee's note; see also United States v. Udey, 748 F.2d 1231, 1243 (8th Cir. 1984) (connecting Rule 803(3) to Rule 801(1) when discussing the lapse of time between an event and a statement about the event).

Even if we assume that Naiden was speaking of Stephanie when he referred to a new person he had met online, the evidence was properly excluded because his statement to his friend on February 14 was not substantially contemporaneous with his conversation with Stephanie on February 13. His statement that he did not believe his new acquaintance to be fourteen was not made as an immediate reaction to his communication with her, but after he had had ample opportunity to reflect on the situation. See United States v. Partyka, 561 F.2d 118, 125 (8th Cir. 1977) (contrasting "self-serving declarations about a past attitude or state of mind" with "manifestations of [the declarant's] present state of mind, his immediate reaction" to an event).

Partyka illustrates how our court has focused on whether the declarant's statement is "trustworthy" when it has had occasion to analyze the admissibility of hearsay evidence under the Rule 803(3) exception. See Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 752 (8th Cir. 1980). Declarations about "a past attitude or state of mind," Partyka, 561 F.2d, at 125, are less likely to be reliable because trustworthiness is diminished if a declarant has had the time to reflect on the potential implications of his conduct. See U.S. v. LeMaster, 54 F.3d 1224, 1231-32 (6th Cir. 1995); U.S. v. Neely, 980 F.2d 1074, 1083 (7th Cir. 1992); U.S. v. Miller, 874 F.2d 1255, 1264 (9th Cir. 1989).The facts of this case show how the passage of time may prompt someone to make a deliberate misrepresentation of a former state of mind. Naiden's communication with Stephanie on February 15, the day after his

conversation with Viste-Ross, provides several examples of how he was otherwise attempting to conceal his criminal intentions. These include his plans to tell his landlady that Stephanie was his niece, his reluctance to send Stephanie money through the mail, and his eventual acquiescence in forwarding it without a return address. The evidence here highlights the significance of the contemporaneous requirement in ensuring that hearsay evidence be reliable in order for it to be admissible under Rule 803(3). We conclude that the district court did not abuse its discretion by excluding the proffered testimony.

Even if the exclusion of the evidence were viewed as erroneous, however, it would not justify overturning Naiden's conviction because the evidence did not affect his substantial rights or have more than a slight effect on the verdict. The proffered evidence was not very strong. The statement allegedly made to Viste-Ross did not identify the new acquaintance as Stephanie or even as a person Naiden had met on February 13. The investigation revealed that Naiden was communicating with many people online, and at least two of the others had represented themselves as minors (PixieTinkerbelle and the fifteen year old girl from Texas). Even if we were to assume that the statement referred to Stephanie, it did not say how old he thought she was. He could have thought that she was not fourteen, but more plausibly fifteen or sixteen. The proffered comment to Viste-Ross was also made very early in his relationship with Stephanie and could therefore have represented a state of mind quite different from Naiden's mindset in his March e-mails or when he went to meet Stephanie's bus on March 7.

The second and more important reason not to interfere with the jury verdict here is the overwhelming amount of evidence establishing Naiden's belief that Stephanie was a minor. He appears from the evidence to have been very worried about the danger of being apprehended for enticing a minor to have sex. Naiden repeatedly exhorted Stephanie to keep their relationship a secret, he deleted all of her communications and instructed her to do likewise, he sent her money and his book without a return address or dedication, he created a cover story for his landlady, and

insisted that Stephanie create a plausible one for her mother as well. He also inquired about her high school studies and advised her to see the school nurse for birth control pills, evidence indicating that he believed Stephanie to be an adolescent. We conclude that the proffered evidence would not introduce reasonable doubt in light of all of the contrary evidence admitted at trial.

Since the district court did not abuse its discretion or commit reversible error in excluding the proffered evidence, we affirm the judgment.

BYE, Circuit Judge, concurring.

I write separately because I believe the district court erred in excluding Viste-Ross's testimony as inadmissable hearsay.

Naiden was charged with the offenses of using the Internet/mail in attempt to entice a child for unlawful sexual activity and attempting to induce a child to travel for unlawful sexual activity. The alleged criminal activity commenced on February 13, 2003, when Naiden began an online relationship with Stephanie, and continued until March 7, 2003, when he went to the Greyhound station to meet her. To convict Naiden of the offenses, the government had the burden of proving Naiden believed Stephanie was under 18 years of age. Thus, evidence of Naiden's belief of Stephanie's age during the time he allegedly engaged in the charged criminal conduct was relevant. At trial, Naiden sought to introduce his friend Viste-Ross's testimony that during a discussion on February 14, 2003 Naiden told Viste-Ross, "I am corresponding with someone online who says they are fourteen but I do not believe it." The government objected to the admission of the testimony on the grounds of hearsay. Defense counsel argued Naiden's statement fell under an exception to the hearsay rule as a statement demonstrating Naiden's state of mind. The district court excluded Viste-Ross's testimony on the grounds it was inadmissable hearsay, without further explanation.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. As noted by the majority, Naiden's statement to Viste-Ross constitutes hearsay because it was a statement Naiden made while out of court and introduced to prove the truth of the matter asserted—that Naiden did not believe Stephanie was 14 years old. Rule 802 provides hearsay is inadmissable unless it falls under one of the Rule's exceptions. Rule 803(3) excludes from the rule prohibiting hearsay: "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3). Naiden's statement "I do not believe it" fits under Rule 803(3) because it is a statement of Naiden's then existing state of mind.

The language of Rule 803(3) requires the statement to indicate the declarant's present state of mind rather than a prior state of mind. As the majority notes, a key circumstantial guarantee of trustworthiness with respect to Rule 803(3) is the requirement that the statement express the declarant's then existing state of mind. The majority asserts Naiden's statement to Viste-Ross was a declaration of his "former state of mind," i.e. his state of mind on February 13 during his online conversation with Stephanie. I disagree. Naiden's use of present tense in stating "I do not believe it" shows the statement manifested Naiden's belief at the time of his discussion with Viste-Ross. See United States v. Partyka, 561 F.2d 118, 125 (8th Cir. 1977) (holding district court erred in excluding defendant's spouse's testimony about statements defendant made to a third party because statements were not declarations of past state of mind but manifestations of present state of mind as immediate reactions to third party's proposal during discussion). Moreover, Naiden's state of mind on February 14 is relevant because February 14 is within the period of time during which Naiden allegedly engaged in the conduct forming the basis of the charged offenses, as noted in the indictment. Compare United States v. Udey, 748 F.2d 1231, 1243 (8th Cir. 1984) (affirming district court's exclusion of exculpatory statements defendant made

-9-

on June 5, which was after his arrest and two days after criminal conduct, because defendant's present state of mind on June 5, the date he made the statements, was not relevant to his state of mind on June 3, the date of the offense in the indictment).

The majority contends the district court properly excluded the statement because Naiden had an opportunity to reflect and fabricate his statement. The absence of an opportunity to reflect is not a requirement included in the text of Rule 803(3), nor have our cases to date governing the state of mind exception under Rule 803(3) imposed such a requirement. See Udey, 748 F.2d at 1243; Partyka, 561 F.2d at 125. According to the treatises, "[t]he federal courts are in some conflict over the issue of whether the court in admitting a statement under Rule 803(3) is authorized to exclude statements based on questionable motivation of the declarant or circumstances of making of the statement." McCormick on Evidence § 274 n.8; see also Christopher B. Mueller & Laird C. Kirkpatrick, 4 Federal Evidence § 438. In my opinion, if a hearsay statement meets the requirements of Rule 803(3), and is not excluded under another Rule, then the jury should consider evidence of the self-serving nature of the statement in determining how much weight to give it. As stated in one treatise:

> The very fact that the exception is silent about candor suggests that courts should be at least hesitant to exclude statements that otherwise fit, on the basis of suspicion on this score. The scheme of categorical exceptions reinforces this point (satisfying express requirements is enough)—only a few, such as the catchall and the ones for business and public records, include broad-brush references to trustworthiness. Adding some support to this point is FRE 806, which lets parties impeach, and support the credibility of, those who make statements admitted under the various exceptions.

Mueller & Kirkpatrick, 4 Federal Evidence § 438. As an example, in the instant case the government argues if the district court had admitted Naiden's statement the result

-10-

would have been devastating for Naiden because it would have permitted the government to introduce damaging evidence to impeach Naiden's statement.

Even if it were proper for the district court to exclude Naiden's statement based on questions about candor, in my view, the facts in this case did not present the district court with a basis to exclude Naiden's statement on such grounds. In the cases in which other courts have considered an opportunity to reflect and fabricate as a permissible consideration under Rule 803(3), the courts generally have considered the amount of time that has passed between the time the exculpatory statement was made and the last alleged act forming the basis of the criminal conduct or the moment the defendant knows he is the subject of criminal investigation. See, e.g., United States v. Reyes, 239 F.3d 722, 743 (5th Cir. 2001) (recorded statements made two months after defendant's last criminal act and after defendant suspected criminal investigation properly excluded); United States v. LeMaster, 54 F.3d 1224, 1231-32 (6th Cir. 1995) (statements made 24 hours after relevant conduct after defendant, who was a lawyer, knew he was under investigation and that FBI had recorded proof against him properly excluded); United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986) (noting "defendant's statements were made two years after the fuel-stealing scheme had ended," and defendants had "potentially an incentive to misrepresent the truth in their conversations"). Naiden's exculpatory statement was made well before his arrest and before his last criminal act. The fact that Naiden continued to engage in incriminating online conversations with Stephanie for three weeks after making the statement to Viste-Ross shows Naiden did not know he was the subject of an undercover police operation when he made the statement to Viste-Ross.

The majority appears to focus on the amount of time that has passed between the time the exculpatory statement was made and the first act forming the basis of the alleged criminal conduct. The majority states: "The facts of this case illustrate how the passage of time may prompt someone to make a deliberate misrepresentation" of their state of mind. The court cites examples of Naiden's attempts to "conceal his criminal intentions" on "February 15, the day after his conversation with Viste-Ross,"

including Naiden's plans to tell his landlady Stephanie was his niece and his reluctance to send Stephanie money through the mail. It cannot be the passage of time, however, which prompted Naiden to conceal his crime because, according to the government, Naiden began concealing his crime from the very beginning. The government argues: "In the February 13, 2003 communication with Stephanie, Naiden had already begun crafting lies to mask his plan to have sex with a child. In this very first communication, he wanted to stage Stephanie's disappearance from Ohio as her running away from home. He told Stephanie he would go to jail if he were caught and demanded she 'tell absolutely no one' about her plan to travel to Minnesota to have sex with him." Appellee's Br. at 15-16 n.8. I also do not believe evidence demonstrating Naiden's attempt to conceal his criminal activity should be the basis for excluding Naiden's statement as self-serving. Relying on evidence of Naiden's attempt to conceal his criminal activity to exclude his exculpatory statement necessarily presumes the existence of criminal activity to conceal. This reverses the presumption of innocence at trial to a presumption of guilt.

Although I believe the district court erred in excluding Viste-Ross's testimony as inadmissible hearsay, I agree the error was harmless in light of the overwhelming evidence demonstrating Naiden's guilt. Accordingly, I concur in the judgment.

_____